**Raymond Lee SMITH, Petitioner,**

v.

**Abbie Marie SMITH, Respondent.**

Family Court of Delaware,
New Castle County.

Submitted: Jan. 27, 1987.
Decided: March 4, 1987.

H. Alfred Tarrant, Jr., of Cooch & Taylor, Wilmington, for petitioner.

Joel D. Tenenbaum, of Woloshin, Tenenbaum & Natalie, Wilmington, for respondent.

ABLEMAN, Judge.

The petitioner (hereinafter "Husband") filed this action for divorce against respondent (hereinafter "Wife") on May 14, 1986, and alleged in his petition that the marriage is irretrievably broken characterized by separation caused by incompatibility. Wife filed an Answer to the Petition on May 29, 1986, in which she admitted all material allegations of the divorce petition with the exception of the ground, which she denied. A hearing on this contested divorce was held on January 27, 1987. The sole issue before the Court is whether this couple is incompatible within the statutory meaning of 13 *Del.C.* § 1503(3).

Interestingly, the testimony regarding the marriage relationship, and the experiences the parties shared in that relationship, was not greatly conflicting. Both parties agree that they are reserved, almost never expressed feelings, and rarely argued. It was in their respective perceptions of these characteristics of the marriage that the parties differ sharply.

The parties were married in Baltimore, Maryland on September 17, 1949, and have three children, all of whom are now adults. The parties lived together in Delaware for more than twenty-five years until Husband moved out of the marital residence in February 1986.

Husband testified that, throughout the marriage, he and his wife shared very few, if any, common interests, desires, or activities, that they did not agree upon important aspects of their lives such as sex, religion, social life, friends, finances, and work, and that these various areas of conflict remained unexpressed, though genuinely felt by him. Eventually he became interested in another woman and developed a relationship with her, thus precipitating the separation. Husband identified his interests as skiing, bowling, sailing, and the Civil War, as well as socializing with friends. He described Wife as disliking skiing, afraid of water, bored by the speeches at Civil War dinner meetings, and withdrawn from people. Her priorities and interests were identified by Husband to be her job, family, religion, shopping, and television. Hus-

band submits that, while he enjoys the companionship of friends from his sailing club and Civil War Roundtable Wife was withdrawn, did not care much for his friends, and was extremely opinionated about the people she met. Husband further reports that the couple's sexual relationship was never very good as Wife was inhibited about sex, treated it more as an obligation than as a pleasurable experience, and refused to discuss the subject on the few occasions that Husband raised it.

With respect to the family's finances, Husband claimed that Wife did not appreciate money or its value, and believed that Husband, who always worked several jobs to provide for the family, put too high a value on money and had too much admiration for people with wealth. As an example of their conflicting values, Husband points to his purchase of a condominium several years ago as an investment and as a desirable residence upon his retirement, while Wife characterized the home as a "dump", publicly stating that she would never move in.

The parties' disagreements regarding religion were equally disheartening to Husband who, as a Methodist, would nevertheless occasionally accompany Wife to Sunday Mass at the Catholic Church. While her religious affiliation did not per se cause conflict, Wife's dogged insistence upon not missing Sunday Mass, and her obsession with meeting her obligations to the Catholic Church, ultimately resulted in Husband avoiding trips and passing up opportunities for travel.

Similarly, Husband and Wife disagreed about work. Husband objected to the fact that Wife accepted full-time employment when their son was only thirteen years old. Nevertheless, Wife's decision to go to work was unaffected by Husband's views. Similarly, Wife objected to the long hours Husband worked, and his pursuit of his real estate license in addition to his regular employment was another source of disagreement for the couple.

During the few years prior to separation, Husband grew increasingly unhappy about his marriage and more and more sought activities away from home. During this final period, the couple's sex life dwindled, and their social life became limited to family, birthdays, and activities with only a few neighbors. Husband became more withdrawn and pursued interests that would keep him out of the home. While the parties did take a trip to Ireland in the Spring prior to separation, Husband stated that he only agreed to the trip because the couple was accompanied by Wife's nephew and family. Husband felt they would "take the pressure off."

As Husband's unhappiness intensified he sought the friendship and companionship of his secretary who had begun working for him in February or March of 1985. By December 1985, Husband and his secretary had become sexually intimate. In that same month, in response to questioning by Wife, Husband admitted his extramarital relationship. Wife reacted by becoming very upset and by insisting that Husband was making a "big mistake." Indeed, as of the time of trial, Wife continued to hold steadfast to her belief that Husband was making a mistake, that he was not himself, and that "when he comes to his senses, he'll come back to me."

In January 1986 the parties physically separated in the home. By February, Husband had moved out. Husband has continued to see his girlfriend, who is divorced, "as often as possible" and indicated unequivocally at trial that he fully intends to continue to see her. While he has not reached a decision regarding remarriage he stated that he no longer loves his Wife, believes the marriage is over, has no intention or desire to return to Wife, even if his current relationship were to falter, and no interest in reconciliation. Indeed, Husband is so committed to his new life that he concluded his testimony by stating that he cannot conceive of any circumstances whereby he would reconcile with Wife, and that, even if his girlfriend were totally out of the picture, he would seek a new relationship rather than return to Wife.

Husband attributes much of the parties' incompatibility to the fact that both parties are reserved in manner and neither felt

comfortable discussing any of the perceived weaknesses in their marriage. Feelings of discontent were experienced silently and attempts to discuss intimate aspects of the relationship proved futile. Gradually Husband backed off in his efforts to communicate and eventually talked to Wife only when it concerned what he termed the "bare essentials." This withdrawal on Husband's part intensified as his dissatisfaction with the marriage intensified. The extramarital relationship was only a symptom or "final blow" to an already tenuous union. The fact that the couple rarely argued was not, according to Husband, an indication of a healthy, blissful life.

Wife, on the other hand, perceived no such discontent or disharmony in her marriage although she agreed with Husband's description of the parties' lack of common interests, hobbies, and priorities. Wife also agreed that the couple rarely argued, but, rather than view this as a flaw in the marriage, deemed it an indication of the healthy quality of the relationship. She allowed Husband to participate in his activities without complaint although she was bothered by the extent of time he spent away from home. She felt that he was the type of man who "needs room" so she accepted his desires and "always understood." Wife was hardly bothered by the lack of affection because she understood that Husband did not easily show affection and she always knew it was there. Wife's response to Husband's testimony regarding his internalized feelings of unhappiness was simply to deny them because, "if he had those feelings *I* would know about it."

Wife's perception of the couple's conflict regarding religion was equally naive. To Wife, Husband's efforts to find a Catholic Church while on vacation was a gesture of caring towards her, rather than the annoyance that Husband described. Even the sexual complaints that were voiced by Husband were overlooked by Wife who was comfortable with her sexual relationship. And, because Husband never complained to her about her lack of participation in social activities, Wife did not regard this as a problem.

Wife testified that, in approximately March 1985, she perceived a change in Husband, which she attributed to the medication he had begun taking for a heart condition. Wife noticed that Husband frequently became depressed and would yell at her, which he had never done before. Finally, in November, she confronted Husband because she felt that something was wrong. Husband then admitted that he did not love Wife any more and that there was someone else whom he admired. It was only then that Wife perceived a problem. She was quite shocked by the revelation and continues to attribute it to the medication, despite the fact that there have been no attempts at reconciliation since that date.

In essence, Wife's position is that there were no arguments and no serious problems between the parties until she learned on November 20, 1985 that her husband had been having an affair with another. woman. Wife maintains that Husband is not the same person to whom she was married for thirty-six years, that he is currently "under the influence" of his girlfriend, and that he was influenced by his divorced friends to leave her. She feels that, when he comes to his senses, Husband will come back to her. She continues to maintain these feelings despite the fact that Husband has not once attempted reconciliation since he left the marital home almost a year ago, testified that he does not love her any more, and has had only sporadic contact with her since separation. Wife continues to have great faith that Husband will change his mind because he does not fully realize what he is doing. She admits that she found the situation intolerable after this extramarital affair was revealed to her.

In the leading case of *S. v. S.*, Del.Supr., 413 A.2d 886 (1980), the Delaware Supreme Court made it clear that, while mutuality as to fault is no longer an essential prerequisite to the granting of a divorce on incompatibility grounds, proof of mutuality as to incompatibility is still required. The Court emphasized that the term requires "the interaction of two (or more) persons" and that the "marital rift or discord must be

genuine and not the fanciful manufacture of one spouse's unlimited will." 413 A.2d at 888. Upon remand of this case to the Family Court, Judge Gallagher, in a thorough analysis of the Supreme Court opinion, set forth certain criteria to be considered in determining whether a divorce should be granted on the grounds of incompatibility. These tests, which have now become the essential elements of inquiry in every incompatibility contested divorce case, were articulated as follows:

> In summary, the elements or inquiries for proving incompatibility are the following:
>
> 1. Was there rift or discord in the marriage?
> 2. Was the rift or discord sufficient to destroy a normal and wholesome marriage relation?
> 3. Did the parties separate as a consequence of their incompatibility?
> 4. Is there any reasonable possibility of reconciliation?
>
> In order to grant a divorce decree for incompatibility, questions 1, 2, and 3 must be answered affirmatively while question 4 must be answered negatively.

In considering these questions the Court in *S. v. S., supra,* nevertheless emphasized that the requirement of mutuality does not mean that one spouse can disable the other from obtaining a divorce simply by insisting that, contrary to the feelings of the other, he or she *is* compatible, or by continuing to profess his or her love in an effort to keep the marriage together.

Similarly, in an excellent examination of the incompatibility ground, both before and after the major changes to the divorce statute, Judge Wakefield concluded that the law must be liberally construed to comport with the realities of modern day matrimonial experience, consistent with the purpose clause of the divorce law. *Samuel S. v. Roseanne S.,* Del.Fam., No. 2294–80, Wakefield, J., (June 12, 1981). Citing the purpose clause of the divorce law, the Court in that case granted the divorce "despite the objection of an unwilling spouse" and despite her contention that the parties were compatible and had broken up only

because of the enticement of the husband by another woman. *See also, Kogut v. Kogut,* Del.Fam., File No. 1401–83, Wakefield, J. (May 14, 1985), *Robert J.T. v. Peggy J.T.,* Del.Supr., 492 A.2d 855 (1985).

I now turn to an application of the tests of incompatibility to the facts of the case at bar.

I am satisfied that there was rift and discord in this marriage. Several years before Husband began seeing his current girlfriend he testified that he had felt an unhappiness that he was unable to discuss with Wife, that he was never as happy as he believed he should be, that his sexual relationship was less than satisfying, and that the parties shared no common interests. Wife too was forced to acknowledge that the parties did not participate in activities together and that Husband's many activities outside the home did begin to bother her, although she preferred to suffer in silence. Rather than openly communicate his discontent, Husband, who had attempted unsuccessfully to discuss these matters previously, sought more activities exclusive of Wife. Clearly, there was rift, or "drifting away" that led ultimately to Husband's moving out of the marital home and beginning openly to see his girlfriend.

■ While the discord, or disharmony, in this marriage did not take on the character of open conflict or demonstrative clashes between the parties, the hallmarks of this marriage were unspoken disagreement, unarticulated unhappiness, inability to share, and a general lack of communication. This quiet dissension convinces the Court that there was in fact discord in this marriage within the statutory meaning of the term "incompatibility".

■ As this Court noted in *Samuel S. v. Roseanne S.,* Del.Fam., File No. 2294–80, Wakefield, J. (June 12, 1981) discord "does not mean that the parties must argue loudly and incessantly to demonstrate disagreement on a wide variety of subjects." Similarly, the fact that the dissension in this instance was manifested by a lack of communication rather than by fiery outbursts or arguments does not necessarily signify

an absence of discord. A marriage where individuals live parallel lives, harbor unspoken feelings of discontent, and rarely share, reflects incompatibility just as one in which the discord is openly apparent.

Moreover, as was emphasized in the *Samuel S. v. Roseanne S.*, case, even if the rift or discord prior to separation was sufficient, once the Husband's extramarital relationship was disclosed to Wife the situation became "intolerable" and "quite upsetting" to her. In fact, the marriage was never serene again. The discord was apparent even at trial when Husband stated that he did not love Wife and would never return to her, while Wife continued to profess her love for Husband, vainly believing that he would return to her when he is away from the influence of "that woman".

■ Turning to the second inquiry in determining incompatibility, I am satisfied that the rift or discord was sufficient to destroy a normal and wholesome marriage relationship. In this case the marriage relationship became gradually attenuated by the parties' inability to communicate, which ultimately resulted in their physical separation. Husband's quiet discontent made him fall out of love with Wife and seek the companionship and intimacy of another woman. The lack of communication was perhaps more devastating to this marriage than open argument would have been, since the failure to discuss problems precluded any attempt at resolution. When Husband revealed his relationship with another woman and subsequently moved out of the residence, the rift and discord that resulted from this situation clearly destroyed whatever marital relationship had existed up to that time. Moreover, there were no subsequent attempts at reconciliation once Husband left the home.

The parties did separate as a consequence of their incompatibility. While Wife would like to believe that, but for the enticement of Husband's girlfriend, the marriage would be blissful, I cannot help but view the extramarital affair as merely a symptom of an already deteriorating relationship. The fact that Husband became involved with a woman other than Wife was symptomatic of a relationship that was obviously unable to fulfill his needs. While the affair may have precipitated the parties' physical separation, it did not cause it. In my judgment, the affair was merely the "crowning blow" to an already failing marriage.

■ Having considered the evidence, I am convinced that there is no reasonable probability of reconciliation in this case. Husband has been living apart from Wife for almost a year with no intervening periods of reconciliation, no second thoughts, and no soul-searching discussions about the future of the marriage. Indeed, the parties have had only sporadic contact during the year since separation. Moreover, Husband was unequivocal in his insistence that the marriage is dead with no hope of reconciliation. There was no ambivalence in Husband's testimony when he stated that he would never return to Wife. While Wife continues to believe she is still in love with Husband, and hopes that Husband will come to his senses and return to her, this is nothing more than wishful thinking on her part. Particularly since it has been a year since separation with no change of heart on Husband's part, Wife's position is clearly untenable. From my view of the parties and their testimony, I do not believe that there is any future to this marriage, notwithstanding Wife's unrealistic views to the contrary.

In summary then, this Court holds that the tests set forth in *S. v. S.*, *supra* and its predecessors have been met, and that the ground of incompatibility has therefore been established. A decree of divorce will be signed effective immediately. The issuance of the decree will be withheld until thirty days after this Order provided that no appeal from this decision is pending.

IT IS SO ORDERED.